Arthur J. GOLDBERG, Secretary of Labor, Department of Labor, Plaintiff,

v.

R. E. SULLIVAN, doing business as Sullivan Lumber Company, Defendant.

Civ. A. No. 509.

United States District Court
M. D. Georgia,
Americus Division.

Aug. 10, 1962.

Beverley R. Worrell, Regional Atty., and George D. Palmer, Birmingham, Ala., for plaintiff.

Fisher & Phillips, Reginald J. Bell, Atlanta, Ga., for defendant.

ELLIOTT, District Judge.

This is an action brought under the authority of Section 17 of the Fair Labor Standards Act (29 U.S.C.A. § 201 et seq.), hereinafter referred to as the "Act", in which the Plaintiff, Arthur J. Goldberg, Secretary of Labor, United States Department of Labor, seeks to enjoin the Defendant from violating the record-keeping, minimum wage and overtime provisions of the Act. The Court proceeded to hear this cause at Americus, Georgia on the 13th day of June, 1962. The Court having considered all of the legal evidence and the arguments of counsel, hereby makes the following:

## FINDINGS OF FACT

(1) The Defendant, R. E. Sullivan, doing business as Sullivan Lumber Company, has for many years operated a sawmill, planer mill and related facilities at Preston, Webster County, Georgia, employing about 100 employees and producing lumber and chipwood, substantial portions of which are shipped outside the State of Georgia. All of the Defendant's employees involved herein were engaged in producing the lumber and chipwood referred to above.

(2) In 1957 Defendant employed a law firm specializing in Wage and Hour law to establish a compliance program for Defendant's operations with the Fair Labor Standards Act.

(3) In May, 1959 the Defendant's operations were investigated by an investigator of the Wage and Hour Division of the United States Department of Labor. At the conclusion of that investigation the Defendant asked for and was sent a letter detailing certain alleged violations of the Act. One of these alleged viola-

tions was the employment contract of Robert L. Snider and the letter discloses that the Investigations Supervisor at that time was uncertain as to this violation and he stated that he would seek advice from his superiors and attorneys regarding it. The Wage and Hour Division never advised Defendant of any decision concerning the validity of the contract.

(4) In a further attempt to follow the Act Defendant employed a former inspector of the Wage and Hour Division to investigate the operation of Defendant's business, and the person so employed conducted a detailed investigation of the Defendant's business and reported his findings to the Defendant. There existed certain areas of disagreement between the findings of the Wage and Hour Division and the private investigation concerning the correct interpretation of the provisions of the Act as applied to Defendant's operations.

(5) Defendant was furnished with compliance posters by the Wage and Hour Division which he posted at different locations on his premises.

(6) In August, 1961 the Defendant's operations were again investigated by an investigator of the Wage and Hour Division. At no time during the course of this investigation nor at any time thereafter did the Wage and Hour investigator inform Defendant concerning what his inspection disclosed or what, if any, changes were necessary to comply with the provisions of the Act.

(7) The first notice Defendant received of the claimed existence of the alleged violations which are the basis of this action was when he was served with a copy of this complaint on December 6, 1961, and then the complaint merely alleged violations of certain sections of the Act without informing Defendant of any details relative thereto. The details of the alleged violations were unknown to the Defendant until Plaintiff responded to interrogatories propounded to him by Defendant on January 5, 1962.

(8) Defendant employs certain employees in the woods crew, also referred to as the logging crew, their duties being

to cut and haul rough timber. On the trial of this case there was considerable conflict in the testimony of the witnesses as to whether these employees of the Defendant worked any hours which were not recorded or paid for. Having had opportunity to observe the witnesses and form an opinion as to their respective credibility, the Court finds as matters of fact that the normal starting time of these employees is 8:00 a. m., and the quitting time is 4:45 p. m. There is a 45-minute lunch period. On some occasions these employees are required to start work before 8:00 a. m., or work beyond 4:45 p. m., but for these periods the employees receive additional compensation. They do not begin work before the expiration of the 45-minute lunch period. On some occasions certain employees prepare their tools before the foreman starts the entire crew to work in the morning. This preparation of tools consists primarily of pouring gasoline into the tank of small one-man portable power saws and occasionally adding oil in a cap on the saw immediately behind the gas tank. The employee also lifts the saw which he intends to use from the body of a truck before beginning work. The saw weighs about 30 pounds. The lifting of the saw from the truck, and the filling of the tank with gasoline, and the adding of oil when such is necessary, consumes about three minutes of time.

(9) Defendant employs certain employees in the operation of a sawmill. The operation of the sawmill is subject to occasional stoppage due to mechanical failures. The history of the operation indicates that these break-downs occur at a rate of something less than once per week. These break-downs are unforeseeable. On some occasions the machinery is repaired within a few minutes, but on other occasions it is necessary to cease operations for several hours. It is sometimes possible for the foreman to estimate the time necessary to make the repairs, but on other occasions it is impossible to estimate the required repair time. If the time can be estimated, the employees are so informed. During these break-down periods there is no work for the employees to do. If the break-down time is thirty minutes or less the employee receives his appropriate compensation just as though he had been working. If the break-down time exceeds thirty minutes all employees are "knocked off" and they are at liberty to do as they please until the machinery is again operating, and the foreman blows a whistle for the employees to return to work. The employees do not receive compensation for this time during which they are "knocked off". Most of the employees live too far from the mill to go home during the break-down periods, but some of those who live nearby have on occasion done so. The employees are free to use the time during which they are knocked off as they please, and if there were any recreation facilities in the area, the employees would be at liberty to go to such places, but the isolated location of the mill usually results in the employees simply going to the commissary to buy candies, soft drinks, etc., or just sitting around smoking and talking until the mechanical repairs have been completed. There is no evidence that any employee has ever been discharged for leaving the premises during a break-down period.

(10) Herbert B. Todd is employed as a lumber inspector. Prior to February 22, 1962 he was paid on a straight salary basis and was not paid extra compensation for overtime. Subsequent to February 22, 1962 he has been employed pursuant to a contract under Section 7(e) of the Act. The legality of this contract is not one of the contested issues in this case, as specified in the pre-trial order, so the only question with which we are concerned here with regard to Todd is whether his employment was exempt under Section 13(a) (1) of the Act prior to February 22, 1962. His primary duties were to inspect, grade and sometimes tally lumber and these duties were performed on the "shipping end", which is separate from the sawmill proper. Some of his work was done according to Lumber Association standards and sometimes according to requirements of special order

customers. He seldom handled any pine. Most of his work was with hardwood and was non-manual. He was a former inspector with the National Hardwood Association and was employed by Defendant because of his reputation and ability in his field. In the performance of his duties he normally had a crew of five or six men under his supervision and his working hours depended upon the amount of lumber that had to be graded and checked.

(11) Robert L. Snider is employed as a log checker and his duties require him to work irregular hours, depending upon the supply of logs and the delivery by the trucks. He is employed pursuant to an individual contract of employment providing for a specified hourly rate of $1.842 and a guaranteed weekly amount of $87.50, which represents 45 hours. This contract provides that Snider will be compensated in an amount equal to one and one-half times the hourly rate for hours worked in excess of forty.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction of the parties and of the subject matter of this action.

(2) The short period of time consumed by the logging crew employees in lifting their saws from the truck and putting gas in the gas tank are insubstantial and insignificant periods and are within the de minimis rule. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515. On the question whether the sawmill employees should be paid for the break-down time in excess of thirty minutes, neither counsel for Plaintiff or Defendant have favored us with the citation of any reported case which we consider to be controlling or even particularly helpful in a determination of this issue. Neither has our own research produced one. As was stated in Mitchell v. Greinetz, 235 F.2d 621, 61 A.L.R.2d 956, 10th Cir., 1956, at page 623:

"* * * because facts differ decided cases are not controlling and are helpful only as they point the way. Some of the factors to consider are whether idle time is spent predominantly for the employer's or employee's benefit, and whether the time is of sufficient duration and taken under such conditions that it is available to employees for their own use and purposes disassociated from their employment time. The cases also make it clear that the answers to these questions must be gleaned from all the facts and circumstances of each case."

The reported cases are not of much aid in "pointing the way" to a decision in this case because the facts and circumstances in the case under consideration are different from those found in any of the reported cases which have come to our attention. The time involved in the reported cases cited by counsel was idle time that was planned by the employer and anticipated by both employer and employee. It was time for a "coffee break" or a "rest break", or some other similar type of temporary idleness which is foreseeable and is part of the expected operations. Usually the question is whether such a coffee break or rest period is predominantly for the benefit of the employer or employee, or whether the relaxation and momentary relief from his duties lends the employee some relief from his tensions and physical or mental exertion, thereby benefitting the employee's health, or whether the relaxation benefits the employer by aiding the employee to be a more efficient worker.

We have none of that involved here. In this case the break-down time is a result of mechanical failure. It is not planned by the employer nor the employee. It is unforeseeable and unanticipated. The time lost in the break-down is not predominantly for the benefit of the employer or the employee, but on the contrary, it is to the detriment of both. The employer loses the use of his machinery and the employee loses his working time. This is not to the advantage of either, and both employer and employee would like to avoid it. The cause of the break-down is neither the employer nor

the employee, but is an unavoidable circumstance. The test of duration is of no help because the time required for repairs varies from minutes in some instances to hours in others, and in no instance is it time "taken" because it is not the choice of either employer or employee that work be suspended.

In Skidmore v. Swift & Co., 323 U.S. 134, at page 136, 65 S.Ct. 161, at page 162, 89 L.Ed. 124, it is said:

"We have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time. Whether in a concrete case such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court. Walling v. Jacksonville Paper Co., 317 U.S. 564, 572 [63 S.Ct. 332, 87 L.Ed. 460]. This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. * * * The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was."

In the case before us the evidence discloses that the "working agreement" between the employer and the employee was that the employer did not expect to pay the employee for the break-down time, and the employee did not expect to be paid for break-down time. Further, it is obvious that there is no essential relation between the nature of service performed by the employee and the break-down. The employee was not engaged to wait as part of the service which he was to perform as is done in the case of life guards, fire guards, policemen, etc. During a break-down the employee was not essential to the employer, nor was he contributing anything to the employer for the operation was at a complete standstill.

■ Since the employer is frequently unable to accurately estimate what time will be required to make the necessary repairs, the employer's practice of paying the employees for periods of break-down up to thirty minutes' duration and not paying them for periods in excess of thirty minutes when they are "knocked off" seems to be a practical solution to this problem in this industry. There is no evidence that these break-downs were planned by the employer in order to circumvent the Act and, as we see it, this is one of those cases which must be determined in accordance with common sense and the general concept of the employment. It is our conclusion that under the Act the employer here is not required to pay the employee for break-downs in excess of thirty minutes. Whether the employer is required to pay for time less than thirty minutes is not at issue.

■■ (3) With regard to the exempt status of the lumber inspector, Herbert B. Todd, we are aware that the Plaintiff has issued a bulletin set forth in Title 29, part 541 of the Code of Federal Regulations, particularly Section 541.207(c) (4), by which the Secretary expresses the view that a lumber grader does not enjoy exempt status, and this Court is cognizant of the rule that substantial weight should be given to administrative interpretations. However, the Secretary recognizes that a lumber inspector may be an exempt employee in Section 541.207(c) (4) when the Secretary says, "This does not necessarily mean, however, that all employees who grade lumber or other commodities are not exercising discretion and independent judgment". This lumber inspector exercises discretion and independent judgment, he does non-manual work directly related to the business operations of his employer, and in general qualifies as an administrative employee. He is an exempt employee by virtue of Section 13 (a) (1) of the Act.

(4) The individual employment contract with Robert L. Snider meets all the requirements of Section 7(c) of the Act, as set forth in Mitchell v. Adams, 230 F.2d 527, 5th Cir., 1956, and Mitchell v. Brandtjen and Kluge, Inc., 228 F.2d 291, 1st Cir., 1955.

The Defendant being in substantial compliance with the Act, the Plaintiff's prayer for injunction is denied and the complaint is dismissed.

So ordered.